```
                   UNITED STATES DISTRICT COURT
                FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KELSEY OUELETTE,                     :
                                     :CIVIL ACTION NO. 3:14-CV-712
          Plaintiff,                 :
                                     :(JUDGE CONABOY)
     v.                              :
                                     :
SALLY HANSEN DIV. DIST.,             :
DELL LABORATORIES, INC.,             :
and COTY US, LLC,                    :
                                     :
          Defendants.                :
                                     :
```
_____

## **MEMORANDUM**

Here we consider Defendants' Motion to Preclude the Report and Testimony of J. Pablo Ross Pursuant to the Daubert Standard (Doc. 13) filed with a supporting brief (Doc. 13-4) on March 5, 2015. Plaintiff filed her opposition brief on April 10, 2015.  (Doc. 18.) Defendants did not file a reply brief and the time for doing so has passed.  Therefore, this matter is ripe for disposition.

## **I. Background**

### *A.   Factual Background*

Plaintiff alleges injury as a result of an incident related to her use of Defendants' Lavender Spa Body Wax on January 22, 2012. (Doc. 1-2.)  Plaintiff had used the product previously without incident.  (*Id.*)  Before she used the product on January 22nd, she avers that the product appeared as it had on previous occasions of use.  (Doc. 1-2 ¶ 15.)  The instructions stated that the product was to be initially heated for thirty seconds at medium heat until it was melted to a spreadable consistency and if the wax was not

melted, it was to be heated for another ten seconds. (Doc. 13-4 at 3.) Plaintiff maintains that she followed the product's instructions, heating it in the microwave for thirty seconds and then an additional ten seconds (two five second intervals (Doc. 13-4 at 4)) when she discovered that the product was not soft enough to spread. (Doc. 1-2 ¶¶ 18-19.) Plaintiff does not know the setting of the microwave on the day of the incident. (*Id.*)

When Plaintiff removed the product from the microwave, she placed it on the kitchen counter. (Doc. 1-2 ¶ 20.) She testified that it was not steaming, boiling or bubbling at the time, and it did not feel hot to her. (Doc. 13-4 at 4.) Leaving the jar on the counter, Plaintiff testified that she put the lid on, walked about eight feet to the garbage can and walked back to where the container was sitting on the counter. (*Id.*) She said that the jar began to sizzle five or six seconds later--it was in her hand at the time. (Doc. 13-4 at 5.) Plaintiff further stated that the jar exploded about three seconds later, adding that she threw the jar after it burned her and was disintegrating in her hands. (*Id.*) Wax ultimately landed on Plaintiff's right arm, right hand, and left hand as well as on the countertop, floor, trashcan and curtains. (Doc. 1-2 ¶ 22.) Plaintiff was rushed to Community Medical Center in Scranton and thereafter life-flighted to Lehigh Valley Hospital's burn unit in Allentown where she was treated for third-degree burns. (Doc. 1-2 ¶¶ 24-25.)

2

Plaintiff's Complaint contains four counts: Count One for Negligence; Count Two for Strict Liability; Count Three for Warranty; and Count Four for Negligent Infliction of Emotional Distress. (Doc. 1-2 at 7-10.)

As noted above, Defendants filed the motion under consideration here on March 5, 2015. (Doc. 13.) They seek to strike the report of Plaintiff's expert, J. Pablo Ross. and to preclude his testimony at the time of trial pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

*B.  Expert Reports*

1.  **Plaintiff's Expert Report**

Plaintiff's expert, J. Pablo Ross, P.E., C.F.E.I., performed his tests with the microwave used by Plaintiff on the day of the incident after testing it and finding it operational. (Doc. 13-6 at 8.)

The wax kit used by Plaintiff was not available for inspection. (Doc. 13-6 at 4.) Mr. Ross was able to purchase identical exemplar kits for testing. (*Id.*) He also purchased updated kits ("new kit") for testing. (*Id.*) The exemplar kit contains the following instructions:

- Remove lid from SPA WAX jar.
- Make sure jar is free of any metal or paper tags.
- Microwave jar of wax for 30 seconds at a medium setting until wax is melted to a spreadable consistency.

3

- If wax has not melted, additional heating time is required. Repeat at 10 second intervals until wax is warm and easily spreadable. DO NOT OVERHEAT.

    APPLY WAX

(Doc. 13-6 at 5.) Mr. Ross observed that the exemplar wax exhibited a gray color on the surface and a purple color underneath and the gray wax surface exhibited signs of cracking as a result of solidified wax. (*Id.*)

Mr. Ross reports that an air bubble formed on the top surface of the wax soon after the exemplar kit wax jar lid and cover were removed--at the time the kit was at room temperature, newly opened and not heated beforehand. (*Id.*) He further stated that the air bubble increased in size slowly until it popped. (*Id.*)

The new kit contains the following instructions:

- Remove lid from LAVENDER SPA WAX jar.

- Make sure jar is free of any metal or paper tags.

- Place on microwavable plate.

- Microwave jar of wax for 30 seconds at a high setting until wax is melted to a spreadable consistency.

- Let jar stand in microwave for 1 minute to cool before removing. USE CAUTION WHEN HANDLING.

- If wax has not melted, additional heating time is required. Repeat at 15 second intervals until wax is warm and easily spreadable. Let

4

>                    jar stand in microwave for 1 minute
>                    to cool before removing between
>                    heating intervals.
>
>           DO NOT OVERHEAT.  DO NOT EXEED [sic] 1 MINUTE
>           TOTAL MICROWAVE HEATING TIME.
>
>               •    Adjust heating time according to
>                    the amount of product remaining in
>                    the jar.  Less time for less
>                    product remaining in the jar.
>
>               •    Overheated wax can cause burns to
>                    the skin.  Handle hot wax with
>                    care.
>
>           APPLY WAX

(Doc. 13-6 at 5.)  Visually, the wax was purple in color--no gray surface was observed on the new wax.  (Doc. 13-6 at 7.)  No bubbling was observed on the wax.  (*Id.*)

Each wax was tested according to package directions and at both fifty percent and one hundred percent microwave power.  (*Id.* at 8.)  The highest temperature reached for the exemplar kit was 122.5 degrees Fahrenheit and for the new kit 122.9 degrees Fahrenheit.  (*Id.* at 9.)  Mr. Ross noted that in general waxes melt above one hundred thirteen degrees.  (*Id.*)

Mr. Ross opines that "[t]he subject incident occurred as a result of hot wax overheating resulting in the wax melting and moisture vaporizing.  This condition resulted in hot wax bursting out of the wax jar, injuring Ms. Oulette and causing her injuries." (*Id.*)  In explanation of this opinion, Mr. Ross theorized that the wax mixture (which consists of a mixture of different oils,

5

compounds and moisture) as a result of microwave heating is heated unevenly. (Doc. 13-6 at 10.) Referencing a Science Daily article about microwaves, Mr. Ross notes that microwave heating is most efficient in water and much less so on fats and sugars, resulting in uneven heating within the wax mixture due to its different ingredients heating at different rates. (*Id.*) Citing the Science Daily article and an information page about waxes and wax compounds, Mr. Ross concludes that the uneven heating results in pockets of moisture vaporizing within the mixture, and vapors from the melted wax rising to the top resulting in air bubbles bursting at the top which result in wax splattering. (*Id.*)

Mr. Ross also opines that the wax kit was improperly labeled--there is no mention of the risk of overheated wax causing burns to the skin, contrary to the new kit instructions. (Doc. 13-6 at 11.) He also opines that the instructions regarding handling of the heated mixture is inadequate on the exemplar kit. (*Id.*)

**2.    Defendants' Expert Report**

Defendants' experts, Thomas W. Eagar, ScD., P.E., and Richard Taylor, Ph.D., also tested a new jar of Sally Hansen Lavender Spa Body Wax which instructed the user to initially heat the product for thirty seconds at a medium setting. (Doc. 13-7 at 2-3.) The experts reviewed heating temperatures associated with ordinary experience, e.g., 140 degrees Fahrenheit is the maximum recommended temperature setting for hot water, and the skin can tolerate 140

6

degrees for approximately five seconds without a burn. (Doc. 13-7 at 2.) They then note that heating the test wax on the high power setting in a 1200-Watt microwave oven continuously for forty seconds yielded an equilibrium temperature of 127 degrees, creating no burn hazard and showing that the jar does not overheat before the wax is warm enough to use. (*Id.*) Defendants' experts also heated a full jar of wax for 2.5 minutes, removing it to stir at thirty-second intervals to aid temperature equilibration. (*Id.* at 3.) They report that the wax material reached 270 degrees, but the wax did not boil, bubble, or pop and there was no indication of damage to the jar which was hot to the touch but lifted out of the microwave with latex gloves. (*Id.*)

Based on the assertions that wax and the esters in the Sally Hansen product do not boil until they reach temperatures of approximately 700 degrees and the polypropylene container will start to soften when it reaches 266 degrees, Doctors Eagar and Taylor opine that the container will be compromised by overheating long before the wax reaches the dangerous point of boiling. (*Id.*) They therefore conclude that "it is scientifically impossible for the polypropylene container to contain wax that is at or near the boiling point. The plaintiff's description of the incident violates basic and established scientific laws and principles." (*Id.*)

Doctors Eagar and Taylor criticize Mr. Ross's report on

7

several bases, including the fact that his test results invalidate his main conclusion because the highest temperature he reached was 122.9 degrees, well below the 700 degree boiling point for wax and approximately 90 degrees below the boiling point for water, and the product contains 99 percent esters, oils, and inorganics, none of which will boil or present any significant quantity of vapor at the temperatures reached in Mr. Ross's experiments.  (Doc. 13-7 at 4.) Defendants' experts add:  "In other words, there is no credible source of the supposed moisture that vaporized, expanded, and burst from the jar."  (*Id.* at 5.)

Defendants' experts also opine that, contrary to Mr. Ross's assertion, the product insert specifically warns against overheating the product, including the following: "a. DO NOT ALLOW WAX TO BOIL[;] b. DO NOT OVERHEAT[;] c. EXCEEDINGLY HOT WAX CAN CAUSE BURNS[;] d. HANDLE MELTED WAX WITH CARE[;] e. IF WAX IS TOO HOT, ALLOW TO COOL BEFORE PROCEEDING."  (Doc. 13-7 at 5.)

### 3. **Plaintiff's Expert's Response**

Mr. Ross provided Plaintiff's counsel with "preliminary comments" regarding the Defendants' experts reports.  (Doc. 18-3 at 1.)  He first notes the Defendant did not properly identify the product they tested and the subject product has undergone multiple iterations and formula changes.  (*Id.*)  Other comments include the following: the report indicates that wax boils at 700 degrees but does not provide support for the statement as it relates to the

8

specific wax mixture; the report provides no support for the proposition that "any trapped vapor would 'expand slowly and escape benignly from the top of the jar. A violent eruption in the manner described by Ms. Oulette is not scientifically possible'"; and the report fails to address the air bubble observed in the exemplar kit. (Doc. 18-3 at 1-2.)

## II. Discussion

As set out above, Defendants assert that Mr. Ross's report should be stricken and he should be precluded from testifying at trial pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). We disagree.

Admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Pursuant to Federal Rule of Evidence of 104, the admission of expert testimony is a preliminary matter to be determined by the court.

In 1993, the Supreme Court defined the scope and operation of

9

Rule 702 regarding scientific knowledge in *Daubert*. The Third Circuit Court of Appeals explained that Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citations omitted).

Here Defendant does not attack the qualifications of Plaintiff's expert. Rather, the reliability and fit of the expert's report are at issue.

The Third Circuit Court of Appeals has established factors for a district court to consider when determining the reliability of proposed expert testimony:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses.

*Schneider*, 320 F.3d at 405.

The "fit" prong of the trilogy relates to the relevance of the proffered expert testimony. *See, e.g., Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000). "It requires a 'valid scientific connection to the pertinent inquiry as a precondition to admissibility.'" *Id.* at 145 n.12 (quoting *Daubert*, 509 U.S. at 591-92). The *Oddi* court provided further guidelines for the

10

application of the admissibility test.

> This standard is not intended to be a high one, nor is it to be applied in a manner that requires the plaintiffs to prove their case twice - they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable. This is a very important distinction. The test of admissibility is not whether a particular scientific opinion has the best foundation or whether it is demonstrably correct. Rather, the test is whether the particular opinion is based on valid reasoning and methodology. The analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination.
>
> Nonetheless, conclusions and methodology are not entirely distinct from one another. A court must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used. A court may conclude that there is simply too great a gap between the data and the opinion proffered.

*Oddi*, 234 F.3d at 145-46 (citations and quotations omitted).

Defendants contend that Plaintiff cannot satisfy the reliability and fit prongs of the inquiry. (Doc. 13-4 at 10-13.) They maintain Mr. Ross's report is not reliable because it is based on unsupported speculation, the most "glaring deficiency" being the fact that he could not replicate the product "exploding" or "going off like a volcano" after forty seconds of heating as described by Plaintiff." (Doc. 13-4 at 12.)

Regarding the "fit" prong, Defendants maintain that because

11

Mr. Ross offers opinions that are not grounded in scientific methods, his testimony would not assist the jury in this case. (Doc. 13-4 at 13.)  They further assert that his opinions do not meet "bare relevance" and would only confuse the jury.  (*Id.*)

We conclude that both expert reports are lacking in certain respects and Defendants have not shown that Mr. Ross's report should be stricken and he should not be allowed to testify at trial.  Although Defendants assert that their experts indicate the violent eruption described by Plaintiff was not scientifically possible (Doc. 13-4 at 9), photos and testimony indicate wax ended up on the counter, floor, and curtains as well as Plaintiff's hands and arm (Doc. 1-2 ¶ 22).   Testimony and photos also show the container was almost completely destroyed, allegedly after Plaintiff removed it from the microwave.  (Doc. 1-2 ¶¶ 21-22.) Defendants assert that the jar would have been compromised long before the wax reached a boiling point, concluding that "even tested under extreme heating conditions, the explosion/jar disintegration alleged by Ms. Oulette did not occur."  (Doc. 13-4 at 8.)  Defendants provide no alternative explanation for the spewing wax and destroyed container.

Similarly Defendants criticize Plaintiff's expert's moisture theory but they have not shown that moisture within the wax mixture *could not* have played a role in the incident and they do not address the bubble which formed at ambient temperature.

Importantly, the particular product at issue could not be tested for moisture content or any other purpose. Therefore, the possibility exists that the specific product at issue deviated from the formula of the tested products.

Thus, while we agree Plaintiff's expert's report is short on cause and effect methodology, and his moisture theory and reference to the single bubble which formed at ambient temperature do not provide a compelling narrative explaining the incident, under a low admissibility threshold, the availability of the malfunction theory, and Defendants failure to address certain key aspects of the report and evidence of record, we conclude the report should not be excluded.[1]  This is a case where Mr. Ross's theory should

---

[1] As recently summarized in a case from the Western District of Pennsylvania, under Pennsylvania law the malfunction theory may be used to establish strict liability where direct evidence of a defect is unavailable. *Wilson v. Saint-Gobain Universal Abrasives, Inc.,* No. 213-cv-1326, 2015 WL 1499477, at *7, 12-13 (W.D. Pa. April 1, 2015).

> To establish a prima facie case of strict product liability, a plaintiff must prove "that the product was defective and that the product caused the Plaintiff's injury." *Wiggins v. Synthes (U.S.A.)*, 29 A.3d 9, 14 (Pa. Super. Ct. 2011). Generally, a plaintiff relies on "direct evidence of an alleged defect in the product to establish the required element[.]" *Barnish v. KWI Bldg. Co.*, 602 Pa. 402, 980 A.2d 535, 539 (Pa. 2009). But sometimes–-say, whenever a product has been lost or destroyed–-a plaintiff cannot introduce direct evidence of a defect. *Rogers v. Johnson & Johnson Prod., Inc.*, 523 Pa. 176, 565 A.2d 751, 754 (Pa. 1989). In such cases, Pennsylvania law allows a plaintiff to resort to the malfunction theory, which does "nothing more"

be tested by the adversary process.  Competing expert reports and cross-examination will allow jurors to weigh the merits of Mr. Ross's theory.  *See*, *e.g.*, *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (citations omitted).

### III. Conclusion

For the reasons discussed above, Defendants' Motion to Preclude the Report and Testimony of J. Pablo Ross Pursuant to the Daubert Standard (Doc. 13) is denied.  An appropriate Order is filed simultaneously with this action.

Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: May 12, 2015

---

> than allow a plaintiff to prove a defect through "circumstantial evidence of product malfunction" whenever the precise defect cannot be shown. *Id.* (citing *MacDougall v. Ford Motor Co.*, 214 Pa. Super. Ct. 1969)). In that way, it is akin to res ipsa loquitor: "both are rules of evidence rather than distinct causes of action" that "allow the factfinder to draw an inference that a defect existed in the product as originally sold." *1836 Callowhill St. v. Johnson Controls, Inc.*, 819 F. Supp. 460, 463 (E.D. Pa. 1993). To create such an inference, a plaintiff must introduce (1) "evidence of the occurrence of a malfunction," and (2) "evidence eliminating abnormal use or reasonable, secondary causes of the malfunction." *Rogers*, 565 A.2d at 754 (citations omitted).

2015 WL 1499477, at *12.